UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANA LAMBETH-GREER,
GENERAL GUARDIAN TO
MINOR CHILD DOE (A.G.),                    Case No. 21-cv-10752

           Plaintiff,                      Paul D. Borman
                                           United States District Judge
v.

FARMINGTON PUBLIC SCHOOLS,
EMILIE LOK JORDAN, ROBERT
HERRERA, and CURRENT
FARMINGTON PUBLIC SCHOOLS
SUPERINTENDENT,

           Defendants.
_____/

**OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF NO. 47), AND
DENYING PLAINTIFF'S SECOND MOTION FOR ORDER TO SHOW
CAUSE (ECF NO. 48) AS MOOT**

In this civil rights case, Plaintiff Dana Lambeth-Greer, general guardian to her

minor son, A.G., alleges that Defendants Farmington Public Schools Superintendent

Robert Herrera,[1] special education teacher Emilie Lok Jordan, and the Farmington

---

[1] The Court notes that since this lawsuit was initiated, Robert Herrera has resigned
and is no longer the Farmington Public Schools Superintendent, and that Christopher
Delgado is the current Superintendent of Farmington Public Schools.

Public Schools, violated A.G.'s rights under the Fourth and Fourteenth Amendments to the United States Constitution, and under state law, based on Defendant Jordan's alleged abuse of A.G. on October 16, 2019.

This matter is before the Court on Defendants' Motion for Summary Judgment seeking dismissal of all claims against all Defendants. The motion has been fully briefed.

Plaintiff has also filed a Second Motion for Order to Show Cause Against Non-Parties Elm Street Clinic and Aldona M. Valivonis, seeking an order compelling those non-parties to show cause why they should not be held in contempt for failing to produce documents in response to a subpoena issued to them. No response has been filed.

The Court held a hearing on Defendants' Motion for Summary Judgment on October 18, 2023, at which counsel for Plaintiff and both Defendants appeared.

For the reasons that follow, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment, dismissing Plaintiff's federal claims in Counts I and II with prejudice, and dismissing Plaintiff's remaining state law claims in Counts III, IV, V, and VI without prejudice. The Court further DENIES Plaintiff's second motion for order to show cause AS MOOT.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

**A.     Factual Background**

In October 2019, Plaintiff Dana Lambeth-Greer's minor child, "A.G.," was a fourth-grade special education student at Kenbrook Elementary, a part of Defendant Farmington Public Schools (FPS). He has Down's Syndrome and is cognitively impaired and has been on Individualized Education Program (IEP) plans for many years.[2] (ECF No. 47-4, Greer Dep. at p. 15, PageID.492) (ECF Nos. 47-7 to 47-10, A.G.'s IEP Plans 2016-2019.)

Defendant Emilie Lok Jordan was A.G.'s fourth grade teacher in October 2019. She has a bachelor's degree in special education and a master's degree in Reading Literacy. (ECF No. 47-3, Jordan Dep. at pp. 6, 11, PageID.402, 407.) Jordan has been teaching special education since 2001 and began teaching special education at Kenbrook Elementary in 2015. (*Id.* at p. 11, PageID.407.) A.G. had been a student in Jordan's class starting in the Fall of 2015 through the date of the incident that is

---

[2] "An individualized education program (IEP) is a written document for students with disabilities ages 3 through 25 that outlines the student's educational needs and goals and any programs and services the intermediate school district (ISD) and/or its member district will provide to help the student make educational progress." https://www.michigan.gov/mde/services/special-education/evaluations-ieps/ieps [https://perma.cc/B7E9-8ZTT].

the subject of this lawsuit. (*Id*.) Plaintiff testified that she had been in Jordan's classroom "[q]uite often" prior to October 16, 2019, and had not witnessed any inappropriate behavior by Jordan. (ECF No. 47-4, Greer Dep. at p. 24, PageID.501.)

On October 16, 2019, at around 2:15 p.m., Jordan asked A.G. to go to his next workstation. (ECF No. 47-2, Jordan Dep. at p. 25, PageID.421.) A.G. flailed his arms and yelled "no, no, no, shut up, shut up." (*Id*.) Jordan took a step back and waited for A.G. to calm down. (*Id*.) When he stopped flailing his arms, she showed him the card that directed him to his next workstation. A.G. knocked the card out of Jordan's hand and again yelled "no, no, no!" (*Id*.) To deescalate the situation, and consistent with her crisis prevention intervention (CPI) training (which teaches techniques to manage difficult or disruptive situations, and physical intervention techniques to deescalate such situations), Jordan held onto A.G.'s left wrist for a few seconds and picked the card up off the floor. (*Id.* at pp. 8-9, 25-26, 29, 50, PageID.404-05, 421-22, 425, 446.) She then held A.G.'s right wrist so they could walk together to the next workstation. (*Id*. at pp. 26, 32-33, PageID.422, 428-29.)

When they got to the workstation, A.G. wiggled out of Jordan's hand and slid down onto the floor, laughing. (*Id*.) Jordan inquired, "are you okay?" (*Id*. at p. 26, PageID.422.) A.G. got up, shook his head yes, and started working. (*Id*.)

A short time later, A.G. showed Jordan his arm with apparent "scuff marks" on it and Jordan assisted him in washing his arm with soap and water. (*Id*. at pp. 26, 43, 46, PageID.422, 439.) Jordan described the marks as "little white peels," and that "the outer layer of the skin was peeling." (*Id*. at p. 46, PageID.442.)

Jordan first attempted to contact Plaintiff, A.G's mother, by phone shortly after the incident, without success. (ECF No. 47-4, Greer Dep. at p. 54, PageID.531.) Jordan left a voicemail message with Plaintiff stating that she was sending an email regarding the incident, which she did, and that she was going to contact A.G.'s nanny which she did. (*Id.*) Jordan then sent a text message to A.G.'s nanny regarding the incident. (ECF No. 47-3, Jordan Dep. at pp. 40-41, PageID.436-37).

After A.G. had returned home for the day, at approximately 5:00 p.m. on October 16, 2019, Plaintiff took A.G. to an urgent care facility. (ECF No. 47-4, Greer Dep. at p. 65, PageID.542) (ECF No. 47-14, Beaumont Urgent Care Records, PageID.813-15.) According to Plaintiff, A.G. complained of pain radiating to his right arm, and the medical practitioner's examination noted that A.G.'s right hand, elbow and upper arm were normal and that he had some tenderness of the right

forearm. (ECF No. 47-4, Greer Dep. at p. 68-69, PageID.545-46.) A.G. was treated with over-the-counter medications and bacitracin. (*Id.*)[3]

When Defendant FPS learned of the incident, it conducted an investigation, which included interviews of Jordan, as well as paraprofessional Lisa Lindenmuth and student teacher Carly Statler, who were both in the classroom at the time of the incident. (ECF No. 47-13, 10/17/19 Investigation Minutes, PageID.808-11.) According to the interview notes, Lindenmuth reported that while she could not see A.G. at the time of the incident, she heard him scream "no, no" to Jordan's direction for him to move to the next workstation. (*Id.* PageID.810.) Lindenmuth stated that A.G. later pointed at his arm, Jordan asked what was wrong, and she then stated that she did not think she scratched him, but that she was sorry if she hurt him. (*Id.*)

---

[3] The Court notes that Plaintiff did not submit any medical records or photographs to the Court regarding A.G.'s claimed injuries. Defendant attaches only the x-ray records from A.G.'s October 16, 2019, visit to the Beaumont Urgent Care, which indicate only that A.G.'s right forearm was viewed because of "right forearm pain x3 following injury…" and that the x-rays showed "no fracture or osseous destructive process.". (See ECF No. 47-14, PageID.813-15.) However, Plaintiff acknowledges in her deposition that the Beaumont records otherwise state that A.G. had some tenderness of his right forearm but no swelling and no deformity, and there was no abrasion, bruising, burn, or laceration noted, and he was treated with over-the-counter pain medication and prescription ointment. (ECF No. 47-4, Greer Dep. at pp. 65-71, PageID.542-58.) In any event, the Court will presume for purposes of this motion, taking all the facts in the light most favorable to Plaintiff, that A.G. suffered fingernail scratches on the top and bottom of his lower right arm as a result of the October 16, 2019 incident.

Statler stated that she was in the room at the time of the incident but could not see A.G. or Jordan. (*Id.* PageID.811.) Statler reported that A.G. was not following directions and was yelling, and that she then saw Jordan guiding A.G. to his scheduled activity. (*Id.*) She stated that Jordan called A.G.'s parent right after the incident. (*Id.*)

FPS also contacted Michigan Child Protective Services (CPS) to report the incident. (ECF No. 47-22, CPS Report, PageID.884-94.) CPS conducted an investigation that resulted in no adverse findings. (*Id.*) Defendant states that the Farmington Hills Police were also involved and found no criminal activity. (*Id.* PageID.893.) Defendant FPS's investigation of the incident resulted in a brief leave of absence for Jordan and a mandate that she complete additional CPI training. (*Id.* PageID.894) (ECF No. 47-5, Greer Dep., Vol II, at p. 167, PageID.646.)

A.G. did not return to Jordan's classroom or Kenbrook Elementary after the October 16, 2019, incident. Plaintiff instead requested that A.G. be transferred to another school in the FPS district, Hillside Elementary. (ECF No. 47-15, 10/29/19 Email, PageID.817.) While at Hillside, A.G. received two one-day suspensions (on 12/3/2019 and 1/16/2020) for being combative and aggressive. (ECF No. 47-4, Greer Dep. at pp. 28-29, 36, PageID.505-06, 513.) In both instances, A.G. was permitted

7

to return to school the following day with no additional punishment or sanction. (*Id.* at pp. 34-36, 41, PageID.511-13, 518.)

### B.    Procedural History

On April 2, 2021, Plaintiff filed this lawsuit as guardian to A.G., alleging claims for: (1) Fourth Amendment violation for excessive force against Jordan; (2) Municipal Liability against FPS; (3) Violation of Michigan's Persons with Disabilities Civil Rights Act, by FPS and Jordan; (4) Discrimination in Education, Elliott-Larsen Civil Rights Act, by FPS and Jordan; (5) Gross Negligence by Jordan; and (6) Assault and Battery by Jordan. (ECF No. 1, Compl.)

On March 24, 2023, Defendants filed their Motion for Summary Judgment, seeking dismissal of Plaintiff's claims, arguing that there are no genuine issues of material fact that preclude the entry of judgment as a matter of law in Defendants' favor on all of Plaintiff's claims. (ECF No. 47, Defs.' Mot.) Plaintiff filed a Response in opposition to this motion (ECF No. 52, Pl.'s Resp.), and Defendant filed a Reply brief in support of its motion (ECF No. 53, Defs.' Reply).[4]

---

[4] Plaintiff had filed a motion requesting an extension of time to file a Response to Defendants' summary judgment motion and then filed a late Response brief. (ECF Nos. 49, 52.) After Defendants filed their Reply brief, Plaintiff's motion for an extension of time was terminated by this Court.

On April 10, 2023, Plaintiff filed a Second Motion for Order to Show Cause as to Elm Street Clinic and Aldona M. Valivonis. (ECF No. 48, Pl.'s Mot.) Plaintiff complains that non-parties Elm Street Clinic and Aldona M. Valivonis, Ph.D have failed to produce records in response to a medical records subpoena issued by Defendants, and Plaintiff requests that these non-parties be compelled to show cause why they should not be held in contempt of court.[5] Defendants did not file a response to this motion.

## II.  LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich.

---

[5] Plaintiff and Defendants have both filed prior motions with this Court seeking an order to show cause why non-parties Elm Street Clinic and Dr. Valivonis should not be held in contempt for failure to respond to the subpoena, and motions for contempt. (ECF Nos. 12, 18.) The Court has granted the orders to show cause, with no response from Elm Street Clinic or Dr. Valivonis, but on January 6, 2023, declined to hold Elm Street Clinic in civil contempt, based on the record before it. (ECF Nos. 17, 22, 34, 39, 43.)

2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he

or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III. ANALYSIS

### A. Plaintiff's § 1983 Excessive Force Claim Against Jordan (Count I)

In Count I of the Complaint, Plaintiff claims that Defendant Jordan violated A.G.'s rights under the Fourth Amendment to the United States Constitution when she "used unreasonable and excessive force when she rapturous clawed Minor Child's arm as she escorted him to his desk," and that Jordan therefore "violated the Minor Child's right to be free from an unreasonable seizure in violation of the Fourth Amendment, enforceable through 42 U.S.C. § 1983." (ECF No. 1, Compl. ¶¶ 41-43.)

As a preliminary matter, and as Defendants state in their motion for summary judgment and Plaintiff has since conceded at oral argument, although Plaintiff brings

her child's claim under the Fourth Amendment, courts have found that "a student's claim of excessive force by a teacher is properly analyzed under the Due Process Clause of the Fourteenth Amendment, rather than under the Fourth Amendment." *Gohl v. Livonia Pub. Sch.*, 134 F. Supp. 3d 1066, 1083 (E.D. Mich. 2015) (collecting cases), *aff'd*, 836 F.3d 672 (6th Cir. 2016); *see Smith v. Washtenaw Intermediate Sch. Dist.*, No. 17-13571, 2020 WL 409659, at *5 (E.D. Mich. Jan. 24, 2020) (explaining that students may sue under the Fourth Amendment for claims arising from actions that are not excessive force, such as disciplinary searches).

The parties here do not dispute that this is an excessive force case, and the Court therefore finds that the Fourteenth Amendment provides the proper legal framework to analyze Plaintiff's excessive force claim against Jordan. *See Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 724-25 (6th Cir. 1996) (holding that the plaintiffs' claims that their teacher slapped one plaintiff and sexually harassed two others did not fall into the category of claims alleging a "right to be free from unreasonable seizures under the Fourth Amendment," but, rather, their claims were "premised on the alleged violation of a constitutionally protected liberty interest, within the meaning of the Fourteenth Amendment, in their personal bodily integrity," and thus applying the shocks-the-conscience standard of substantive due process).

12

### 1. Whether Jordan's alleged actions constitute a violation of the Fourteenth Amendment

The Fourteenth Amendment provides that a state may not deprive an individual "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "[I]t is well established that persons have a fourteenth amendment liberty interest in freedom from bodily injury." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 506 (6th Cir. 1996) (citations omitted). The test for whether an injury is actionable under the Fourteenth Amendment requires the Court to ask whether the complained-of conduct "shocks the conscience." *Domingo v. Kowalski*, 810 F.3d 403, 410 (6th Cir. 2016) (citing *Lillard*, 76 F.3d at 724). The Sixth Circuit Court of Appeals has explained that, under the "shocks the conscience" standard,

> [a] substantive due process claim is quite different than a claim of assault and battery under state tort law. Substantive due process is concerned with violations of personal rights of privacy and bodily security. The substantive due process inquiry must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.

*Lillard*, 76 F.3d at 725 (brackets and ellipses omitted); *see also Domingo*, 810 F.3d at 411 (stating the same in a case involving a challenge to educational and disciplinary techniques rather than corporal punishment).

13

The Sixth Circuit Court of Appeals has set a high bar for conduct that "shocks the conscience." That court found in *Domingo* that a special education teacher's conduct did not "shock the conscience" where the teacher was accused of "gagging one student with a bandana to stop him from spitting, strapping another to a toilet to keep her from falling from the toilet, and forcing yet another student to sit with her pants down on a training toilet in full view of her classmates to assist her with toilet-training." *Domingo*, 810 F.3d at 410-11. In *Gohl v. Livonia Public School District*, 836 F.3d 672, 679-80 (6th Cir. 2016), the Sixth Circuit held that a special education teacher's conduct in allegedly aggressively jerking a student's head backwards and yelling in his face, did not rise to the level of conscience-shocking behavior. In *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 726, (6th Cir. 1996), the Sixth Circuit concluded that a teacher's single slap of a student, and the same teacher's rubbing of a separate student's stomach, accompanied by a sexually suggestive remark, did not violate the students' substantive due process rights. But in *Ellis ex rel. Pendergrass v. Cleveland Municipal School District*, 455 F.3d 690, 700 (6th Cir. 2006), the court found that a jury could find a constitutional violation "because [merely for forgetting] to bring a pencil to class, [a teacher] grabbed [a student] and slammed her head against the blackboard [and] ... then threw her on the ground and choked her for approximately one minute. As a result, [the student]

suffered petechiae and contusions on her neck. Later, [the student] also exhibited symptoms consistent with post-traumatic stress disorder."

In the public school context, the Sixth Circuit Court of Appeals has adopted two distinct frameworks for assessing whether a student's constitutional claim shocks the conscience: one for excessive corporal punishment, the other for educational techniques involving force. *Domingo*, 810 F.3d at 411. Under the corporal punishment inquiry, courts assessing whether conduct shocks the conscience consider "whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking the conscience." *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987) (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980)). This case does not involve an allegation of corporal punishment, but rather an alleged educational technique involving force.

In considering whether an educational technique, such as at issue in this case, involves force shocking the conscience, the Sixth Circuit Court of Appeals utilizes the four part test developed by the Third Circuit Court of Appeals in *Gottlieb v. Laurel Highlands School District*, 272 F.3d 168 (3d Cir. 2001):

a) Was there a pedagogical justification for the use of force?; b) Was the force utilized excessive to meet the legitimate objective in this situation?; c) Was the force applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and d) Was there a serious injury?

*Domingo*, 810 F.3d at 411 (citing *Gottlieb*, 272 F.3d at 173). These four factors "provide[] a useful, though not necessarily exhaustive, list of factors to balance in evaluating a student's claim that a teacher's educational and disciplinary techniques violated the Fourteenth Amendment." *Id.* The Sixth Circuit reminds that a teacher's "educational and disciplinary methods … may have been inappropriate, insensitive, and even tortious. This does not, however, render them unconstitutional." *Id.* at 416.

The Court will address each *Domingo/Gottlieb* factor in turn.

### a.  Pedagogical justification

The first factor to consider is whether there was a pedagogical justification for Jordan's alleged use of force. *Domingo*, 810 F.3d at 411 (explaining that the question is "whether the teacher's allegedly unconstitutional conduct is properly *construed* as an attempt to serve pedagogical objectives") (internal quotation marks and citation omitted, emphasis in original). "When a teacher employs physical force, whether the result of an official school policy or part of an informally-administered disciplinary regime, it is consistently held to have some pedagogical objective when it is focused on a disruptive student." *Ross v. Lamberson*, 873 F. Supp. 2d 817, 821-22 (W.D. Ky.

2012) (citation omitted). The "'key inquiry is not what form the use of force takes but whether the use of force is related to the student's misconduct at school and for the purposes of discipline.'" *Domingo*, 810 F.3d at 412 (quoting *T.W. v. Sch. Bd. of Seminole Cnty., Fla.*, 610 F.3d 588, 598-99 (11th Cir. 2010) (internal quotation marks, brackets, and punctuation omitted)). In other words, this first factor "looks to the ends motivating the teacher's actions and not the means undertaken to achieve those ends." *Id.* "Abuse alone … is not the standard at issue on [these kinds] of due process claims," *id.* at 411, and not every tortious act qualifies as a violation of the Fourteenth Amendment.

For example, in *Domingo*, the Sixth Circuit found that strapping a student with disabilities to a toilet and squeezing children's faces were "questionable" "educational and disciplinary techniques," but the actions did not lack a legitimate pedagogical purpose because the techniques were more closely related to the pedagogical purposes of toilet-training and attention-focusing techniques than to abuse. *Id.* at 412-13.[6] In *Gohl v. Livonia Public School District*, 836 F.3d 672, 679

---

[6] The Sixth Circuit in *Domingo* provided the following additional examples of conduct other courts have found serve a pedagogical purpose and therefore do not "shock the conscience:"

> [F]or example, the Eleventh Circuit evaluated whether a special-education teacher's patently "abusive behaviors" were capable of being

construed as having a disciplinary or educational purpose. *T.W.,* 610 F.3d at 594-96. The teacher in *T.W.* frequently directed profane insults at T.W., an autistic student in her classroom, calling him "lazy, an asshole, a pig, and a jerk." *Id.* at 594. When her insults provoked T.W. into agitation and misbehavior, the teacher—who outweighed T.W. by 150 pounds—acted even more inappropriately by, among other things, yanking T.W. from his chair so that his legs struck his desk, throwing him to the ground face-down, climbing on top of him while pulling his arms or leg behind his back, twisting his arm behind his back, and intentionally tripping him. *Id.* at 595-96. Despite the teacher's obviously abusive behavior, the Eleventh Circuit nevertheless found that her "use of force ... was related to T.W.'s disruptive or self-injurious conduct and was for the purpose of discipline." *Id.* at 599.

Similarly, in *Flores v. Sch. Bd. of DeSoto Par.,* 116 Fed. Appx. 504, 510-11 (5th Cir. 2004), the Fifth Circuit held that a student failed to state a substantive due process claim against his coach for shoving the student against a wall, putting the student in a headlock, and insulting the student. The court in *Flores* found that the coach's assault, while improper and possibly tortious, was motivated by the coach's intent to discipline the student for tardiness and insubordination. *Id.* Because the coach "intended to discipline the student for the purpose of maintaining order and respect," the Fifth Circuit affirmed the district court's dismissal of the student's Fourteenth Amendment claim. *Id.; see also D.D. v. Chilton Cnty. Bd. of Educ.,* 701 F. Supp. 2d 1236, 1241-42 (M.D. Ala. 2010) (teacher's temporary restraint of a disabled child in a Rifton Chair was a "reasonable response" to the child's "disruptive behavior"); *G.C. v. Sch. Bd. of Seminole Cnty., Fla.,* 639 F. Supp. 2d 1295, 1305 (M.D. Fla. 2009) (special-education teacher's acts of striking, grabbing, and restraining a disabled student did not "shock the conscience," because the teacher's restraints were done for "safety purposes").

*Domingo*, 810 F.3d at 412.

(6th Cir. 2016), the Sixth Circuit found that the teacher offered a pedagogical purpose for allegedly grabbing the student by the top of his head and aggressively jerking it back, and then yelling in his face "You need to listen," when she testified she was using a special education technique called "redirecting" to focus and hold the child's attention after he threw a toy.

In this case, Defendants have presented unrebutted evidence of a pedagogical justification for Jordan's alleged use of force against A.G. Specifically, Jordan presented unrebutted testimony that she used an identified crisis prevention intervention technique – a "hold" of A.G.'s wrists – to deescalate A.G.'s verbal and physical refusal to move to the next station, and his physical invasion of her personal space. (ECF No. 47-3, Jordan Dep. at pp. 8, 25, 29, 50, PageID.404, 421, 425, 446.) Jordan confirmed her justification for using the hold technique in her email to A.G.'s mother sent the same date of the incident (ECF No. 47-4, Greer Dep. at pp. 55-58, PageID.532-35 (discussing the email and agreeing that the "hold" employed by Jordan was "consistent with the appropriate behavior for a cognitively impaired Downs syndrome diagnosed student").)

In her Response brief, Plaintiff offers no evidence to refute or cast doubt on Jordan's pedagogical justification. However, at the hearing on Defendants' motion, Plaintiff's counsel argued that A.G.'s IEP plan did not provide for the use of physical

19

cues or techniques with A.G., that Plaintiff did not agree that a physical cue such as the preventative hold should be used on A.G., and that Plaintiff did not have prior notice of any significant behavioral issues with A.G. before the October 16, 2019, incident. However, Plaintiff's allegations are belied by a review of Plaintiff's prior IEPs, which were signed by Plaintiff and which reported that A.G. had "difficulty completing assignments independently in all content areas without staff support," often had to be reminded "to keep his hands to himself," he "needs multiple verbal/visual reminders to sit down, thumb out of the mouth, listen, and use inside voice during instructional time," he "displays non-compliant behavior about 75% of the time," he "requires multiple verbal/visual/gestural cues to stay on task…," he "continues to struggle behaviorally at times with compliance," and that he requires "[t]he use of positive behavioral interventions and supports, and other strategies, to address behavior because the student has behavior that impedes his [] learning or the learning of others." (ECF No. 47-8, 2017 IEP, PageID.685, 688) (ECF No. 47-9, 2018 IEP, PageID.709, 711) (ECF No. 47-10, 2019 IEP, PageID.731

The Court finds that Jordan's one-time alleged use of force on A.G. on October 16, 2019, was for a proper educational or disciplinary purpose and thus related to a legitimate, identifiable pedagogical objective – deescalating A.G.'s verbal and physical refusal to move to the next station, and his physical invasion of

Jordan's personal space. *See Domingo*, 810 F.3d at 412 (stating that the "'key inquiry is not what form the use of force takes but whether the use of force is related to the student's misconduct at school and for the purposes of discipline.'") (citation omitted). This first factor weighs in Jordan's favor.

### b. Use of excessive force

The Court next examines whether Jordan's techniques were excessive with respect to the stated pedagogical goals. *Domingo*, 810 F.3d at 413-14. The Sixth Circuit has "made clear that, when a teacher's allegedly unconstitutional conduct was motivated by a legitimate educational or disciplinary goal, the conduct must be clearly extreme and disproportionate to the need presented to be excessive in the constitutional sense." *Id.* at 414 (citing *Saylor v. Bd. of Educ. of Harlan Cnty., Ky*, 118 F.3d 507, 511 (6th Cir. 1997) (holding that a teacher's paddling of an eighth grade student so hard that it knocked the breath from the student and left visible bruises and swelling, was not "so severe" or "disproportionate to the need presented" that it violated the Fourteenth Amendment) and *Lillard*, 76 F.3d at 726 (finding that a single slap, with no pedagogical purpose whatsoever, was not unconstitutionally excessive because it "was neither severe in force nor administered repeatedly")).

The Court finds that Plaintiff has presented no evidence that Jordan's "hold" of A.G.'s wrists – which Jordan testified lasted for approximately 10 seconds – was

so "severe in force," or otherwise constituted a "brutal and inhumane" abuse of power considering the stated pedagogical goals. This use of force occurred a single time and only for the duration intended to correct A.G.'s behavior. Plaintiff has failed to offer any evidence to the contrary.

Accordingly, viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to raise a material question of fact regarding whether the force Jordan used was not excessive, and this second factor weighs in favor of Jordan.

### c. Good faith or malicious intent

In evaluating the third *Domingo/Gottlieb* factor, the Court considers whether Jordan acted "'in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm[.]'" *Domingo*, 810 F.3d at 414 (quoting *Gottlieb*, 272 F.3d at 174). This factor focuses the Court's attention on "'what animated [Jordan's] action or [her] intent in acting.'" *Id.* "[I[t is the harm, and not the contact, that must be intended." *Gottlieb*, 272 F.3d at 175. "Absent direct evidence of a malicious intent, courts look to the surrounding circumstances to determine whether a school official's conduct was undertaken in a good-faith effort to educate, train, or maintain discipline, or for the purpose of causing harm." *Domingo*, 810 F.3d at 414.

The Sixth Circuit in *Domingo* provided an instructive example of a court's finding of malicious and sadistic intent:

> In *H.H.* [*v. Moffett,* 335 F. App'x 306 (4th Cir. 2009)], a disabled child's mother became concerned because, after her child enrolled in a new special-education class, the child exhibited growing distress and suffered from increasingly regular "grand mal" seizures. *Id.* at 307-09. The child's mother attached a recording device to the child's wheelchair, which recorded teachers insulting the child, cursing at her, conspiring to prevent her from receiving necessary educational services, and keeping her restrained in her wheelchair for hours at a time. *Id.* at 309. The Fourth Circuit held that the objective evidence of the teachers' open hostility to the child proved that their abusive conduct had no valid purpose; instead, it was motivated by malice, callousness, and deliberate indifference to the child's rights. *Id.* at 313.

*Domingo*, 810 F.3d at 414-15.

The Sixth Circuit Court of Appeals in *Domingo* then found, in the case before it, there was no evidence that the teacher regularly berated or insulted her special-education students, conspired to keep them from receiving necessary services, or punished them without any legitimate reason for doing so. *Id.* at 415 (finding that instead, the teacher's purpose was to assist her students in meeting their educational goals or to curb disruptive behavior).

Similarly, in this case, the Court finds that this third factor weighs in Jordan's favor. Plaintiff has presented no evidence that Jordan held A.G.'s wrists "maliciously and sadistically for the very purpose of causing harm." Rather, the

23

unrebutted summary judgment evidence demonstrates that Jordan utilized an established crisis prevention intervention, or CPI, technique to stop A.G. from flailing his arms and to walk him to the next workstation. (ECF No. 47-3, Jordan Dep. at pp. 25-27, 29, PageID.421-23, 425.) This evidence is supported by the statements of the paraprofessional and the student teacher in the room at the time of the accident. (ECF No. 47-13, Investigation, PageID.810-11.) Plaintiff in fact acknowledges in her Response brief that A.G. suffered his injury "while [Jordan was] utilizing a preventive hold technique[.]" (ECF No. 52, Pl.'s Resp., PageID.925.) Plaintiff has offered no evidence of Jordan's desire to harm A.G. or that Jordan regularly abused or punished A.G. without any legitimate reason for doing so.

Thus, the Court finds that this third factor weighs in Jordan's favor. *See Gottlieb*, 272 F.3d at 175 (holding that the teacher's "placing of his hand on a student's shoulder and moving her mere inches" for no pedagogical purpose, which caused the student to propel backwards into a door jam and injure her back, "is not 'a brutal and inhumane abuse of official power literally shocking to the conscience'") (quoting *Hall*, 621 F.3d at 613).

Plaintiff contends in her Response brief that Jordan tried to "cover up" the incident by washing A.G.'s arm with soap and warm water and then allegedly

24

changing her story regarding how A.G. was injured. But even accepting as true Plaintiff's allegation that Jordan attempted to "cover up" the incident (despite summary judgment evidence of her prompt report of the incident to Plaintiff, to A.G.'s nanny, and to the school), these after-the-fact actions do not create a fact issue as to Jordan's intent at the time of the incident. As stated above, this factor focuses the Court's attention on "'what animated [Jordan's] action or [her] intent in acting.'" *Domingo*, 810 F.3d at 414. Plaintiff has presented no evidence that Jordan acted with a malicious or sadistic intent when she held A.G.'s wrist and guided him to the next workstation.

Accordingly, the Court finds that this third factor weighs in favor of Jordan.

### d. Serious injury

The final *Domingo/Gottlieb* factor is whether A.G. suffered a "serious injury." *Domingo*, 810 F.3d at 415 (citing *Gottlieb*, 272 F.3d at 173.) While the Sixth Circuit has not established a "bright-line" requirement that a plaintiff demonstrate a serious physical injury, as opposed to a serious psychological injury, the burden of establishing the seriousness of the injury is demanding. *Id.* at 415-16 (finding no demonstration of serious injury where plaintiff alleged teacher strapped a child to a gurney in the hallway and gagged him with bandana).

25

The Court finds that Plaintiff has presented no evidence of any serious injury to A.G., physical or otherwise. Construing the facts in the light most favorable to Plaintiff, Jordan's alleged "digging [of] nails" into A.G.'s skin while employing a CPI hold on A.G.'s wrist to deescalate A.G.'s verbal and physical refusal to move to the next station, and his physical invasion of Jordan's personal space, which resulted in an abrasion to his arm and treatment with an antibiotic ointment, simply does not constitute a "serious injury" supporting a Fourteenth Amendment claim. *See Zdrowski v. Rieck*, 119 F. Supp. 3d 643, 670 (E.D. Mich. 2015) (finding that the teachers' use of a transport hold (in which two people stand on either side of the child, holding the child's wrist in their outside hands and hooking their inside arms under the child's arms) to bring a child who was upset and with a history of violent outbursts and who was threatening self harm to the office, resulting in a single bruise on a student's forearm and red marks on both forearms, does not shock the conscience and therefore is not sufficient to defeat summary judgment); *Ross*, 873 F. Supp. 2d at 821 (holding that teacher's "quick, violent turn of the child's head," which resulted in a cervical/spinal strain, did not shock the conscience where the student was disruptive and the teacher's actions were motivated by her desire to quiet the student); *Minnis ex rel. Doe v. Sumner Cnty. Bd. of Educ.*, 804 F. Supp. 2d 641, 648-49 (M.D. Tenn. 2011) (where teacher grabbed student's arm to keep him from

running wildly in classroom, bruises to student's arm did not shock the conscience). A.G. did not cry or scream while Jordan employed the hold technique, and in fact he laughed just moments after and then began working at the new workstation. (ECF No. 47-3, Jordan Dep. at pp. 25-26, 29, PageID.421-22, 425.)

As for Plaintiff's claim of psychological injuries to A.G., the Sixth Circuit in *Domingo* left open the question of whether purely emotional trauma, without accompanying physical injury, may implicate a constitutional liberty interest in bodily security. *Domingo*, 810 F.3d at 416 ("We … can imagine a case in which evidence of serious psychological injury could support a Fourteenth Amendment substantive due process claim."). The court in *Domingo* found that the plaintiff failed to present evidence of any injury, physical or otherwise. *Id.*

The Court similarly finds here that Plaintiff fails to show that A.G. suffered a psychological injury sufficient to support a substantive due process claim. Plaintiff alleges in the Complaint that, "[a]fter the October 16, 2019 [incident], Minor Child Doe has been suspended twice from school, he is fearful of adults, his speech has deteriorated, he sleeps with the lights on, and he suffers from post-traumatic stress disorder" (ECF No. 1, Compl. ¶ 33), but she fails to provide any summary judgment evidence supporting those allegations. In her Response brief, Plaintiff refers to Dr. Gerald Shiener's report, but she failed to attach a copy of that report to her summary

judgment briefing, and thus it cannot be considered by the Court. *See Doe v. Livonia Pub. Schs.*, No. 13-cv-11687, 2018 WL 4956086, at \*12 (E.D. Mich. Oct. 12, 2018) (finding that plaintiff failed to show that the child suffered a psychological injury because she did not provide evidence, such as by procuring an individual evaluation by a child psychologist).

The Court therefore finds, construing all the facts in the light most favorable to Plaintiff, that Jordan's educational technique in holding A.G.'s wrists and escorting him to the next workstation on one occasion, resulting in abrasions to his arm, even if those actions could be considered tortious, were not unconstitutional, as "the substantive due process claim is quite different that a claim of assault and battery under state tort law." *Lillard*, 76 F.3d at 725 (quoting *Webb*, 828 F.2d at 1158); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) (the Due Process Clause does not impose liability "whenever someone cloaked with state authority causes harm"); *see also Minnis*, 804 F. Supp. 2d at 652 (holding that "the teacher's act of grabbing the child's face and shaking his head on one occasion, and grabbing his arm on another occasion hard enough to cause bruising, simply do not rise to the level of a 'conscience-shocking,' brutal and inhumane abuse of authority," even though the child was three-and-a-half-years old, mentally disabled, and diagnosed as having an autism-spectrum disorder).

28

Therefore, Defendants are entitled to summary judgment on Plaintiff's excessive force claim against Jordan.

### 2. Qualified immunity

Defendants argue alternatively that Jordan is protected by qualified immunity from individual liability for Plaintiff's Fourteenth Amendment excessive force claim. The Court agrees.

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine "shields 'government officials performing discretionary functions' from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Qualified immunity thus balances "the need to hold public officials accountable when they exercise power irresponsibly" with "the need to shield

29

officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Although a defendant ordinarily bears the burden of proof for an affirmative defense, where a defendant raises qualified immunity, the plaintiff "bears the burden of showing that [the] defendant[ ] [is] not entitled to qualified immunity." *Gavitt v. Born*, 835 F.3d 623, 641 (6th Cir. 2016) (citing *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)). Thus, in opposing a defendant's claim of qualified immunity, a plaintiff must show: (1) the defendant violated a constitutional right based on the facts alleged, and (2) that the right was clearly established. *Plumhoff v. Rickard*, 572 U.S. 765, 773-74 (2014); *Pearson*, 555 U.S. at 232. The district court may address the qualified immunity analysis in any order. *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016). If the plaintiff is unable to establish the violation of a constitutional right, the Court's inquiry ends, and the defendant is entitled to immunity. *Perez v. Oakland Cnty.*, 466 F.3d 416, 426-27 (6th Cir. 2006). However, even if the plaintiff establishes a constitutional violation, he still bears the burden of showing that the constitutional right was clearly established at the time of the violation. *Cunningham v. Shelby Cnty., Tenn.*, 994 F.3d 761, 765 (6th Cir. 2021).

The Court finds that because, as discussed above, the record does not establish that Jordan's alleged conduct constitutes a constitutional violation, Plaintiff cannot

defeat Jordan's qualified immunity defense, and that Jordan is therefore entitled to qualified immunity for Plaintiff's § 1983 claims under the Fourteenth Amendment. *See Perez*, 466 F.3d at 426-27 (citing *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 771 (6th Cir. 2005)).

The Court further finds that Plaintiff has failed to establish that Jordan violated a clearly established constitutional right. To do so, Plaintiff must point to a proper case showing that reasonable teacher would have known their actions were unconstitutional under the specific circumstances he or she encountered. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). When determining whether an individual's rights are clearly established for purposes of qualified immunity, "[t]he sources of clearly established law to be considered are limited. [Courts in this Circuit] look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth] [C]ircuit, and finally to decisions of other circuits." *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013). Further, courts "must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018) (quoting *Plumhoff*, 572 U.S. at 778-79). Indeed, a court's task

31

"requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)).

Generally speaking, "[i]t is well established that persons have a [F]ourteenth [A]mendment liberty interest in freedom from bodily injury." *Webb*, 828 F.2d at 1158. Thus, A.G. "had a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity." *Claiborne Cnty.*, 103 F.3d at 507. However, the Court may only deny qualified immunity if "[t]he contours of the right ... [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court thus considers "'whether the violative nature of *particular* conduct is clearly established' ... 'in light of the specific context of the case, not as a broad general proposition.'" *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft*, 563 U.S. at 742; and *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). The Supreme Court has clarified that "the very action in question" need not have been previously held unlawful, but "in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640.

Plaintiff here has not met her burden of pointing to a case showing that a reasonable teacher in Jordan's position would have known her actions were unconstitutional under the specific circumstances of this case.

Plaintiff cites to only one unpublished Ohio district court case in her Response brief "as an example of a case where a teacher was not protected by qualified immunity," *H.M. v. Bd. of Educ. of The Kings Local Sch. Dist.*, No. 1:14-cv-64, 2015 WL 4624629 (S.D. Ohio Aug. 3, 2015). (ECF No. 52, Pl.'s Resp., PageID.930.) However, that unpublished Ohio district court case fails to clearly establish that Jordan's conduct shocked the conscience. In that case, five multi-handicapped children and their parents sued their teacher and the school district. 2015 WL 4624629, at *1. The plaintiffs alleged in their complaint that the teacher subjected the children to various forms of abuse, including being told the teacher hates them, making them crawl to the bathroom, isolating them, physically restraining them, depriving them of snacks, intentionally knocking a table into the mouth of a student, and pushing students. *Id.* at *1-3. In ruling on a Fed. R. Civ. P 12(c) motion for judgment on the pleadings, not a motion for summary judgment, the Ohio district court found that the plaintiffs' allegations as to the conduct, along with the complete lack of an alleged pedagogical purpose, are sufficient to survive a motion to dismiss, and that *"the ultimate determination as to whether the conduct was conscience shocking is not properly made at this early stage." Id.* at *6 (emphasis added), *8 (finding that plaintiffs' allegations "that Defendant physically and/or emotionally abused them and that such conduct was undertaken intentionally and without a

33

pedagogical purpose," construed in the light most favorable to plaintiffs, "state a plausible claim for relief under the circumstances"). The court then found that, at this early stage of the litigation, "a reasonable teacher knew or should have known that actions taken *with the intent to injure a special education student and without any pedagogical purpose* were constitutionally impermissible[.]" *Id.* at *11 (emphasis added); *see also id.* at n.10 (acknowledging that "[w]hile discovery may further clarify and narrow the law that must be deemed clearly established to deny qualified immunity at a later stage of the litigation, the Court finds that the application of the law to the allegations construed in the light most favorable to Plaintiffs is clearly established.").

Aside from the facts that (1) the unpublished *H.M.* Ohio district court case is not a "proper source" of clearly established law, *see Martin*, 712 F.3d at 961, and (2) it is procedurally distinguishable from this case decided at the summary judgment stage, after the close of discovery, the alleged actions by the teachers in *H.M.* are not at all like the complained of conduct by Jordan in this case. In addition, *H.M.* involved an action allegedly taken without any legitimate pedagogical goal, whereas Defendants here have presented unrebutted summary judgment evidence that Jordan utilized an established hold technique for around 10 seconds for the legitimate pedagogical purpose of gaining control of a verbally and physically noncompliant

34

student. Thus, for all these reasons, *H.M.* fails to provide notice to Jordan that her alleged conduct constitutes a "clearly established" constitutional violation about which a reasonable person would have known.

The Court therefore finds that Jordan is entitled to qualified immunity on Plaintiff's § 1983 excessive force claim against her.

### B. Plaintiff's § 1983 Claim Against FPS (Count II)

Plaintiff's sole claim against Defendant FPS is a *Monell* municipal liability claim. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Plaintiff alleges that FPS has a policy, custom, or practice about how incidents are reported to parents of African American students and how investigation findings and actions are communicated to parents of African American students, and that "[t]he above-described policy, custom, or practice was the direct, proximate cause of Defendant Emilie Jordan violating Minor Child Doe's Fourth and Fourteenth Amendment rights.…" (ECF No. 1, Compl., ¶¶ 44-45.)

To prevail in a § 1983 claim against a municipality, a plaintiff must demonstrate: (1) the deprivation of a constitutional right; and (2) that the defendant (municipality) is liable for the violation. *Ellis*, 455 F.3d at 700. Thus, municipalities, such as FPS, cannot be liable for employee conduct if there was no underlying constitutional violation. *Gohl*, 836 F.3d at 685 ("No one is liable for a constitutional

violation that never occurred" and it is unnecessary to look at a municipality's policies or customs) (citing *Graves v. Mahoning Cnty.*, 821 F.3d 772, 776 (6th Cir. 2016)); *Ryan v. City of Detroit*, No. 11-cv-10900, 2015 WL 1345280, at *8 (E.D. Mich. Mar. 25, 2015) ("The failure of a plaintiff to demonstrate the violation of a constitutional right means that a *Monell* claim fails as a matter of law.").

First, because the Court finds, as stated above, that Jordan did not violate A.G.'s constitutional rights, FPS cannot be liable as a matter of law. *See Gohl*, 836 F.3d at 685. The Court therefore grants Defendants summary judgment on Plaintiff's *Monell* claim against FPS. *See Domingo*, 810 F.3d at 416 ("Because we find that Kowalski's conduct did not rise to the conscience-shocking level required of a Fourteenth Amendment substantive due process claim, there is no basis for holding her supervisors or school district liable.") (citing *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470-71 (6th Cir. 2006) (noting that a prerequisite of supervisory and *Monell* liability under § 1983 is unconstitutional conduct by a municipal employee)).

However, even if Plaintiff did provide evidence creating a genuine issue of material fact as to whether there was a constitutional deprivation, Plaintiff would still need to prove FPS is liable for that violation. Municipalities like FPS are liable under § 1983 for employees' constitutional violations "only where the municipality's policy or custom led to the violation." *Robertson*, 753 F.3d at 622

36

(citing *Monell*, 436 U.S. at 694-95). "A municipality 'may not be sued under § 1983 for an injury inflicted solely by its employees or agents.'" *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (quoting *Monell*, 436 U.S. at 694). Plaintiff must instead show one of the following to prove this claim:

> (1) the existence of an illegal official policy or legislative enactment;
>
> (2) that an official with final decision making authority ratified illegal actions;
>
> (3) the existence of a policy of inadequate training or supervision; or
>
> (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess*, 735 F.3d at 478 (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). Plaintiff must further show that this custom, policy, or practice was the "moving force" behind the violation of the plaintiff's constitutional rights. *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647-48 (6th Cir. 2012).

Here, Plaintiff asserts that FPS has a policy, custom, or practice involving how incidents are reported to parents of African American students and how investigation findings and actions are communicated to parents of African American students. (ECF No. 1, Compl., ¶ 44.) Plaintiff alleges that "[t]he above-described policy, custom, or practice was the direct, proximate cause of Defendant Emilie Jordan

violating Minor Child Doe's Fourth and Fourteenth Amendment rights.…" (*Id.* ¶ 45.)

Plaintiff however fails to provide any summary judgment evidence of this alleged policy or that the alleged policy in any way caused or was the "moving force" behind Jordan's alleged excessive force against A.G. Plaintiff relies on a March 5, 2020, email from then-Superintendent Herrera to Plaintiff following up on Plaintiff's concerns about the way "the incident was addressed" by the School District. (ECF No. 1-5, 3/6/2020 Email, PageID.39-40.) In that email, Mr. Herrera indicated that he requested Dr. Jackie McDougal to "conduct an internal review of how the incident [with Jordan and A.G.] was addressed" based on Plaintiff's "concerns about the manner in which the District addressed the matter." (*Id.*) The email reported the findings of Dr. McDougal, including that the District met expectations in several areas and that the initial reporting of the incident to Plaintiff and the District's communication of the investigation findings to Plaintiff following the incident are "areas of concern to be addressed[.]" (*Id.*) However, there is no mention in this email of any incident(s) apart from the October 16, 2019, incident involving A.G. and, contrary to Plaintiff's allegation, no mention of how other incidents are reported to parents of African American students or that factfinding and incident protocols are specific to any race. (*See id.*) *See Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 495

(6th Cir. 2020) ("Because municipal liability requires an unconstitutional 'policy' or 'custom,' we have held that an allegation of a *single* failure to investigate a single plaintiff's claim does not suffice.") (citation omitted).

More relevant, Plaintiff fails to demonstrate how an investigation or alleged policy, even a flawed one, that occurred *after* the incident at issue could be a moving force behind the alleged excessive force used by Jordan against A.G. on October 16, 2019. *See Burgess*, 735 F.3d at 479 ("[Defendant's] after-the-fact approval of the investigation, which did not itself cause or continue a harm against [plaintiff], was insufficient to establish the *Monell* claim" because "[s]uch an outcome would effectively make the Board liable on the basis of *respondeat superior*, which is specifically prohibited by *Monell*."); *Pineda*, 977 F.3d at 495 ("Because the injury will have already occurred by the time of the specific investigation, 'there can be no causation' from that single failure to investigate."). Rather, a failure-to-investigate claim or a claim that the municipality's investigation was inadequate "requires 'not only an inadequate investigation in this instance,' but also 'a clear and persistent pattern of violations' in earlier instances." *Pineda*, 977 F.3d at 495 (citation omitted). "That is, 'there must be multiple earlier inadequate investigations and they must concern comparable claims.'" *Id.* Plaintiff fails to provide summary judgment evidence of any such prior instances.

In the Response brief, Plaintiff also discusses the alleged racial disparity at FPS and the data regarding disproportionate suspensions of special-education African American students. (ECF No. 52, Pl.'s Resp., PageID.932-34, citing Exhibits at ECF Nos. 52-4 and 52-5.) That does not track. Plaintiff here alleges that Jordan used excessive force against A.G. on the one occasion, and she admits that A.G. was not suspended in connection with that incident, or indeed at any time while he was a student of Jordan's. (ECF No. 47-4, Greer Dep. at p. 87, PageID.564.) This is not a case about suspensions, but about an alleged one time use of excessive force. (See ECF No. 52, Pl.'s Resp., PageID.935-36 (contending that FPS's "policy, customs, and beliefs, were the moving force behind Defendant Jordan's conduct and use of excessive force.").) Thus, suspension information is irrelevant to Plaintiff's *Monell* claim.

Plaintiff therefore fails to allege sufficient facts to establish that FPS had an unconstitutional policy, custom, or practice that was the moving force behind Jordan's alleged excessive force conduct on October 16, 2019, and her *Monell* claim against FPS fails for this reason as well.

### C. Plaintiff's State Law Claims (Counts III-VI)

Plaintiff's remaining claims are Michigan state law claims for violations of the Michigan Persons with Disabilities Civil Rights Act (PWDCRA) (Count III) and

the Elliott-Larsen Civil Rights Act (ELCRA) (Count IV), as well as for gross negligence (Count V), and assault and battery (Count VI).[7]

A district court may exercise its discretion to dismiss remaining state law claims when the federal claims are disposed of, as they are in this case. *Brown v. Cuyahoga Cnty.*, 517 F. App'x 431, 436 (6th Cir. 2013) ("28 U.S.C. § 1367 allows a district judge to decline to exercise supplemental jurisdiction over state-law claims if the district court has dismissed all claims over which it has original jurisdiction." (ellipsis omitted)). Plaintiff's Michigan state law claims will therefore be DISMISSED WITHOUT PREJUDICE. *See Gohl*, 134 F. Supp. 3d at 1090 ("Having determined that Plaintiff's federal claims lack merit, the case does not retain a federal character," and "the Court declines to extend supplemental jurisdiction over Plaintiff's state law claims[.]"); *Doe v. Livonia Pub. Schs.*, 2018 WL 4953086, at *17 (dismissing plaintiffs' state law claims without prejudice when the federal claims were dismissed with prejudice).

---

[7] Plaintiff's counsel conceded at oral argument that her assault and battery claim should be dismissed for failure to comply with the applicable one-year statute of limitations.

41

### D. Plaintiff's Second Motion for Order to Show Cause Against Elm Street Clinic and Aldona M. Valivonis (ECF No. 48)

After Defendants filed their Motion for Summary Judgment, but before Plaintiff responded to that motion, Plaintiff filed a Second Motion for Order to Show Cause Against Elm Street Clinic and Aldona M. Valivonis, seeking an order compelling non-parties Elm Street Clinic and Aldona M. Valivonis to show cause why they should not be held in contempt for failing to produce documents in response to a subpoena issued to them. (ECF No. 48.) No response has been filed.

Plaintiff does not mention non-parties Elm Street Clinic or Aldona M. Valivonis in her Response to Defendants' Motion for Summary Judgment, and she makes no argument in her summary judgment briefing that any documents from Elm Street Clinic or Aldona M. Valivonis are relevant or necessary for her Response pursuant to Fed. R. Civ. P. 56(d).

Thus, because the Court grants in part Defendants' motion for summary judgment, dismissing the federal claims with prejudice and dismissing the state law claims without prejudice, it will deny Plaintiff's Second Motion for Order to Show Cause Against Elm Street Clinic and Aldona M. Valivonis as moot.

## IV.  CONCLUSION

For the reasons set forth above, the Court:

**GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (ECF No. 77),

**DISMISSES** Plaintiff's § 1983 claims in Counts I and II of the Complaint **WITH PREJUDICE**, and

**DISMISSES** Plaintiff's remaining state law claims in Counts III, IV, V, and VI **WITHOUT PREJUDICE**.

The Court further **DENIES** Plaintiff's Second Motion for Order to Show Cause Against Elm Street Clinic and Aldona M. Valivonis **AS MOOT**.

This is a final order that closes the case.

IT IS SO ORDERED.

|  | s/Paul D. Borman |
|---|---|
| Dated: October 19, 2023 | Paul D. Borman<br>United States District Judge |

43